No. 22-55024

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

Jarron Edmond
*Plaintiff/Appellee*

v.

Kurt Lockwood
*Defendant/Appellant*

On Appeal from the United States District Court for the Central District of
California No. 2:20-cv-06636-MCS-KS
The Honorable Mark C. Scarsi

---

## APPELLEES' ANSWERING BRIEF

---

Brian T. Dunn, Esq. (SBN 176502)
Email: bdunn@cochranfirm.com
THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Boulevard, Suite 1010
Los Angeles, California 90010
Telephone: (323) 435-8205
Facsimile: (323) 282-5280
Attorneys for Plaintiffs/Appellees Jarron Edmond

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**The Deposition of Plaintiff Jarron Edmond** . . . . . . . . . . . . . . . . . . . . . . . 4

**The Deposition of Kurt Lockwood** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**1.** **Lockwood Observes an "Unusually Large" Group of People at
Vermont Square Park** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**2.** **Upon Arriving at the Scene, Lockwood Does Not Observe Any Person
Consuming Alcohol, and Witnesses No Criminal Activity** . . . . . . . . . . 6

**3.** **Upon his Arrival, Lockwood Cannot Identify a Single Gang Member,
Either by Attire or by Personal Knowledge, among Those Present at the
Park** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**4.** **Despite Seeing No Known Gang Members, and No One Dressed in
Gang Attire, Lockwood "Suspected" That Edmond Was a Gang**

Member Based Only on (1) His Race, and (2) His Presence at the

Gathering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5. **Lockwood's Purported Justification That Edmond Posed a Deadly**

**Threat Is Belied by Years of his Personal Experiences as a**

**Gang Officer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**ANALYSIS OF LOCKWOOD'S BODY WORN CAMERA FOOTAGE** . . 10

**Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**I. LOCKWOOD VIOLATED EDMUND'S FOURTH AMENDMENT**

**RIGHTS WHEN HE SHOT HIM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**A. The Ninth Circuit Has Clearly Established That the Mere Presence of a**

**Weapon Does Not Justify the Use of Deadly Force** . . . . . . . . . . . . . . . 17

**B. This Court Has Clearly Established That When an Officer Fires**

**Multiple Rounds, Each Shot must Be Independently Evaluated in**

**Terms of the Objective Reasonableness of Each Round Fired** . . . . . . 18

**C. Lockwood's Purported Justification for Shooting is Contradicted by All**

**Available Evidence, by his Own Experiences as an Officer, and by the**

**Dictates of Logic and Common Sense** . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**II. OFFICER LOCKWOOD IS NOT ENTITLED TO QUALIFIED**

**IMMUNITY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**A.** **Clearly Established Case Precedents Demonstrate Than An Officer's Use of Deadly Force Against a Non-Threatening Suspect in Possession of a Firearm Constitutes an Unlawful Use of Deadly Force** . . . . . . . . 23

**B.** ***Easely v. City of Riverside*** **is Totally Distinguishable From this Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**III.** **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**STATEMENT OF RELATED CASES** . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## <u>TABLE OF AUTHORITIES</u>

*Curnow v. Ridgecrest Police*

    952 F.2d at 321 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

*Deorle v. Rutherford*

    272 F.3d 1272 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Easely v. City of Riverside*

    890 F. 3d 851 (9th Cir. , 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Estate of Lopez v. Gelhaus*

    871 F.3d 998 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*George v. Morris*

    724 F.3d 1191 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gonzalez v. City of Los Angeles*

    2017 U.S. Dist. LEXIS 224067 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Graham v. Connor*

    490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harris v. Roderick*

    126 F.3d 1189 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hammer v. Gross*

    932 F.2d 842, 846 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

-iv-

*Heck v. Humphrey*

512 U.S. 477 (1994)

*Liston v. County of Riverside*

120 F.3d 965 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Long v. City and Cnty. of Honolulu*

511 F.3d 901, 906 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Menjivar v. City of Los Angeles*

2007 U.S. Dist. LEXIS 95928 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Santos v. Gates*

287 F.3d 846 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Smith v. City of Hemet*

394 F.3d 689 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Tennessee v. Garner*

471 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Willis v. City of Fresno*

2014 U.S. Dist. LEXIS 52565 (E.D. Cal. Apr. 14, 2014) . . . . . . . . . . . 18

*Zion v. Cty. of Orange*

874 F.3d 1072, 1076 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## <u>STATEMENT OF JURISDICTION</u>

Plaintiff/Appellee Jarron Edmon, after being repeatedly shot by Defendant/Appellant Los Angeles Police Department Officer Kurt Lockwood, brought this action in the District Court under 42 U.S.C. § 1983, with pendant state law claims for battery and negligence, alleging that Defendant Officer Lockwood's used excessive and unreasonable force against him during the shooting incident. The parties agree that the District Court had subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), and properly exercised supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

On December 29, 2021, the District Court issued its Order denying summary judgment to Appellant Officer Kurt Lockwood. On January 4, 2021, Appellant Lockwood filed his Notice of Appeal, entitling this Court to jurisdiction under 28 U.S.C. § 1292.

## ISSUES PRESENTED ON APPEAL

1.    In this § 1983 action involving allegations of excessive force arising out of a police shooting incident, did the District Court err in determining that genuine issues of fact precluded Defendant Officer Kurt Lockwood's entitlement to summary judgment as to Plaintiff's clams for deprivations of civil rights under the Fourth Amendment?

2.    In this § 1983 action involving allegations of excessive force arising out of a police shooting incident, did the District Court err in determining that genuine issues of fact precluded Defendant Officer Kurt Lockwood's entitlement to qualified immunity as to Plaintiff's clams for deprivations of civil rights under the Fourth Amendment?

## STATEMENT OF FACTS

### Introduction

In this officer involved shooting case, it is undisputed that Plaintiff Jarron Edmond, an African American man, sustained two gunshot wounds after being fired upon with four rounds from the service weapon of Defendant Officer Kurt Lockwood at the conclusion of a short foot pursuit. It is further undisputed that Officer Lockwood had not observed Mr. Edmond, or any other person, involved in any illegal activity prior to engaging the foot pursuit that culminated in the officer involved shooting.

During summary judgment proceedings, the District Court evaluated Officer Lockwood's justification for using deadly force, analyzing the testimony of both Mr. Edmond and Officer Lockwood, as well as the video footage and audio recordings extracted from the Officer Lockwood's body worn video ("BWV"), which partially captured the events leading up to and including the shooting incident, and concluded that genuine issues of fact surrounding Officer Lockwood's purported justification for using deadly force precluded his entitlement to summary judgment and qualified immunity.

3

### The Deposition of Plaintiff Jarron Edmond

The entire deposition of Plaintiff Jarron Edmond was presented to the trial court, and is attached herein. (ER 75-101)

In summary, on the night of the incident, Jarron Edmond, ("Edmond") had come together at the Vermont Square Park with family members and friends to mourn the passing of his childhood friend D'Mario Lovely, whose funeral had been held earlier that day. Edmond had attended the services, and later the gathering at the park, with D'Mario's brother, Billy Lovely. (ER 77-78; 10:14-13:3)

Prior to the shooting incident, Edmond was discussing compact disks with a man present at the gathering when he saw a police officer running towards the area where the men were standing. Upon seeing the officer running towards him, Edmond took off running because, in his own words, he had a "fear of getting caught with a gun". (ER 82, 84; 32:14-35; 16: 38:17-19) When the chase began, Edmond was holding a cell phone in his right hand and had a firearm in his left pants pocket. (ER 83-84; 36:16-38:11)

When he was running through the middle of the apartment complex that was unfamiliar to him, Edmond could hear the officer say "Put your hands up, stand back, or I'ma shoot". The only commands Edmond recalled hearing prior to the

4

shooting were "Show me your hands or I'm going to shoot you." In response to this, Edmond put his hands up while he was running. After hearing shots fired at him, Edmond ran to his right down a walkway in the apartment complex.(ER 84-85; 39:21-41:14)

While running away, Edmond was struck with two rounds, the first one striking his right hand, knocking the cell phone out of his hand. Another round struck Edmond on his right flank, after which he immediately fell to the ground. Edmond never held, never reached for, and did not even touch the firearm in his left pocket at any time during the incident. Edmond surmised that the firearm in his left pocket fell out of his pocket as he was falling to the ground after having been struck. Edmond did not see the firearm fall out of his pocket during the shooting incident, nor did he feel it fall out of his pocket at any time during the time in which he was struck with two rounds and fell to the ground. Edmond first noticed the firearm after being ordered to roll onto his stomach following the shooting. (ER 85-86; 41:22-46:12)

### The Deposition of Kurt Lockwood

The entire deposition of Defendant Officer Kurt Lockwood ("Lockwood") was presented to the trial court and is attached herein. (ER 102-126) Significant excerpts from his deposition testimony are illustrated as follows:

5

1. **Lockwood Observes an "Unusually Large" Group of People at Vermont Square Park**

Q.  How many people were there at the park that you identified generally prior to exiting your vehicle?

A.  I would say there was a group of, approximately, 60 to 80 people.

Q.  And you described that as "unusually large"?

A.  Yes, sir.

Q.  What would you determine to be a typical number of people there?

A.  So from my experience with seeing that park usually on a daily that I'm working, a group of 15 to 20 would not be uncommon. (ER 108; 24:13-23)


2. **Upon Arriving at the Scene, Lockwood Does Not Observe Any Person Consuming Alcohol, and Witnesses No Criminal Activity**

Q.  And as you exited the vehicle, let's say in the first 30 seconds or so, did you see any crimes in progress?

A.  No, sir.  (ER 110; 32:23-33:1)

---

Q.  Okay. Now, you told us that you saw some beer bottles, but you didn't see anybody drink beer, and you saw some Solo cups. Did I get that right?

A.  That's correct, sir.

Q.  So you didn't see any criminal activity associated with the alcohol?

A.   Specifically somebody drinking it, not that I recall.  (ER 112; 41:13-20)

**3.      Upon his Arrival, Lockwood Cannot Identify a Single Gang Member, Either by Attire or by Personal Knowledge, among Those Present at the Park**

Q.      Did you see any gang members prior to exiting your vehicle?

A.      That I could give you a name of or recall their exact person, no, sir. (ER 108; 25:6-9)

− − −

Q.      Having recently reviewed the video, did you see any people that you associated with membership in any kind of a gang?

A.      I recall seeing in the video people that I remember seeing on previous occasions; however, I could not state to their names or their membership of a gang.

Q.      Did you see any clothing or attire being worn by any of the people in the video that you would associate with the membership in a gang?

A.      Not that I recall.  (ER 109; 27:2-21)

**4.      Despite Seeing No Known Gang Members, and No One Dressed in Gang Attire, Lockwood "Suspected" That Edmond Was a Gang Member Based Only on (1) His Race, and (2) His Presence at the Gathering**

According to Lockwood, the people present at the park on the evening of

the incident were predominantly African American. (ER 110; 33:12-16)

7

As illustrated below, upon extensive questioning on the subject, Lockwood was unable to articulate any reasons for his determination that Edmond was a gang member that did not involve (1) his race, and (2) his presence at the gathering:

Q.   Now, prior to shooting, did you believe Mr. Edmond was a gang member?

A.   I suspected.

Q.   Why?

A.   Based on my knowledge of that area, the fact that the gang that hangs out there is the Rollin 40s, is a primarily African American gang, there's numerous members congregating in that park, it would be uncommon for it to be anybody other than the Rollin' 40s in that area. I had not had the chance to investigate any further as to tattoos or whether Mr. Edmond wanted to claim membership with the Rollin 40s. But based on all of my knowledge of that area and what I had seen, it was a possibility, in my mind, that he was, in fact, a gang member.

Q.   Once again, what was it about him that connected you to gang membership?

A.   Just based on the initial observation of him loitering in a park where it's known for Rollin 40s gang members to congregate, him being the race of what that --

Q.   Let me stop you briefly. Did you think every man in there, that was standing, was in the Rollin 40s?

A.   No, sir.

8

Q.     So aside from him loitering, what else specifically was it about him
       that led you to believe that he was in some kind of a gang?

A.     The fact that he was armed with a firearm.

Q.     All right. Anything else?

A.     Of the initial observation, no, sir.

Q.     Prior to shooting him is what I'm talking about. Anything else prior to
       shooting?

A.     Again, just my training and experience of the knowledge of that area,
       the fact that there was numerous members out there, based on the fact
       that that race is predominantly African American in that gang, that he
       fit the race in that gang, was, in fact, in that known claimed territory
       at what appeared to be a gang gathering. (ER 124; 89:1-90:15)

**5.     Lockwood's Purported Justification That Edmond Posed a
         Deadly Threat Is Belied by Years of his Personal Experiences as a
         Gang Officer**

Lockwood estimated that he has encountered "several hundred" suspects in

the field as a gang officer that he later determined to be in possession of concealed

weapons. (ER 116; 54:19-25).  In all of these encounters, Lockwood has never

been shot, nor has he been shot at, by a suspect in the line of duty. (ER 106; 16:4-

15). In fact, in all of his experiences as a gang officer, he has *never* encountered a

fleeing suspect with a gun who has tried to shoot or threaten him with that gun. To

the contrary, Lockwood's own deposition testimony reveals that the majority of

his prior experiences with fleeing suspects involved people who were *trying to get rid of guns,* as is illustrated by the following deposition excerpt:

Q.    I'm going to read a statement I found on page 11. And it says, "Having dealt with many people that were armed, gangsters that tried to get away, they'll typically try to get the gun and just kind of get out of sight and throw the gun, get rid of the gun." Do you remember that aspect of your statement?

A.    I do, sir.

Q.    And that reflected your experience and training as of this day; would that be true?

A.    So based on that statement, it is my opinion that, typically, yes, most individuals you encounter that are armed with firearms are just trying to get rid of it through multiple means, whether it's discarding it in a car or discarding it in a bush, running and throwing it, running into a house, discarding it and coming back out. I've encountered numerous situations in which, typically, most individuals are just trying to discard the firearm. (ER 116; 55:11–56:3)

## ANALYSIS OF OFFICER LOCKWOOD'S
## BODY WORN CAMERA FOOTAGE

All of the audio and video references to Officer Lockwood's body worn camera footage discussed and published in this case are, publicly available on the "youtube" website, and can be publicly viewed at the below listed url:

https://www.youtube.com/watch?v=gtzgzrZjBWE&t=198s

**2:41 IMAGE (Ex.1)**



At 2 minutes and 41 seconds, Edmond (left) Stumbles and Lockwood is heard yelling "Hey, Hey!"

**2:42 IMAGE (Ex.2)**



At 2 minutes and 42 seconds, Edmond's arms are visibly raised.

11

**2:45 IMAGE (Ex.3)**     **2:45 IMAGE (Ex.4)**

   

At 2 minutes and 45 seconds,
Edmond is running with his
Back facing Lockwood.

**2:45 IMAGE (Ex.5)**



**2:46 IMAGE (Ex.6)**        **2:46 IMAGE (Ex.7)**

 

At 2 minutes and 46 seconds, Edmond can be seen
running with hands raised, briefly turning to look back
at Lockwood.

**2:46 IMAGE (Ex.8)**



13

**2:47 IMAGE (Ex.9)**    **2:47 IMAGE (Ex.10)**

  

At 2 minutes and 47 seconds,
Edmond can be seen clearly with both hands raised.
Lockwood is heard commanding:
"Hey-LET ME SEE YOUR FUCKING HANDS RIGHT NOW!"
Lockwood continues by commanding, "GET ON THE GROUND!"
I'm GONNA SHOOT YOU!"

**2:48 IMAGE (Ex.11)**



At 2 minutes and 48 seconds,
Edmond can still be seen clearly with both hands raised.
Lockwood is still heard yelling:
"GET ON THE GROUND- I'm GONNA SHOOT YOU!"

## 2:49 IMAGES

### 2:49 IMAGE (Ex. 12)



### 2:49 IMAGE (Ex.13)



At 2 minutes and 49 seconds,
Edmond can be seen turning the corner
immediately before the first shot is fired.

### 2:49 IMAGE (Ex.14)



### 2:49 IMAGE (Ex.15)



### 2:49 IMAGE (Ex.16)



### 2:49 IMAGE (Ex.17)



At the end of the 49th second mark, Edmond then runs into a open
area and is shot multiple times. The smoke from Lockwood's
muzzle flash is visible in one of the frames.

**Summary of Argument**

While Officer Lockwood has always maintained that Mr. Edmund was somehow threatening him with a firearm found near Mr. Edmond's person at the conclusion of the incident, Lockwood cannot articulate any demonstrable facts demonstrating any cognizable threat posed by Mr. Edmond, who has testified that he did not hold, or even touch, the subject firearm at any time during the subject incident.

**Argument**

## I.

## LOCKWOOD VIOLATED EDMOND'S FOURTH AMENDMENT RIGHTS WHEN HE SHOT HIM

In *Graham v. Connor,* 490 U.S. 386, 395 (1989) the Supreme Court held that factors that are relevant in assessing whether the use of force was objectively reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. The Court did not limit the inquiry to these factors, however. "'Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' the reasonableness of a seizure must instead be

16

assessed by carefully considering the objective facts and circumstances that confronted the arresting officers." *Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Graham,* 490 U.S. at 396); *see Hammer v. Gross,* 932 F.2d 842, 846 (9th Cir. 1991) ("The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of all the relevant circumstances" (emphasis original)).

The Ninth Circuit has cautioned that determining whether an officer acted reasonably in an excessive force case "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002); see also Smith, 394 F.3d at 701 (observing that excessive force cases "almost always turn on a jury's credibility determinations"). As a result, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos,* 287 F.3d at 853; *see also Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury," [citations]).

## A.   This Court Has Clearly Established That the Mere Presence of a Weapon Does Not Justify the Use of Deadly Force

Under clearly established Ninth Circuit case law, a suspect's mere presence of a weapon does not justify the use of deadly force. *Deorle v. Rutherford*, 272

17

F.3d 1272, 1281 (9th Cir. 2001); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-25 (9th Cir. 1991); *Accord George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013)(A suspect's mere possession of a gun does not automatically render an officer's use of force reasonable). However, when a suspect points a gun in an officer's direction, which undisputedly did not occur in the instant case, the officer is entitled to respond with deadly force and that use of force would be entitled to qualified immunity. *See Long v. City and Cnty. of Honolulu,* 511 F.3d 901, 906 (9th Cir. 2007.)

**B.** **This Court Has Clearly Established That When an Officer Fires Multiple Rounds, Each Shot must Be Independently Evaluated in Terms of the Objective Reasonableness of Each Round Fired**

The Ninth Circuit has repeatedly affirmed the principle that, even if a suspect had previously posed a legitimate threat, an officer cannot use deadly force against a suspect who no longer poses a threat. *See Zion v. Cty. of Orange,* 874 F.3d 1072, 1076 (9th Cir. 2017) (Although first nine rounds fired against knife-wielding suspect were justified, subsequent rounds fired against wounded and disabled suspect were not unlawful as a matter of law, Court held: "When police confront a suspect who poses an immediate threat, they may use deadly force against him. But they must stop using deadly force when the suspect no longer poses a threat."); *See also Willis v. City of Fresno,* 2014 U.S. Dist. LEXIS

52565, 2014 WL 1419239, at *9-10 (E.D. Cal. Apr. 14, 2014) (concluding that,

where "[t]he jury found [the defendant officer] violated [the decedent's] Fourth

Amendment rights because his use of deadly force with the final shot(s) was

objectively unreasonable" and the jury could have found that decedent was not

reaching for a revolver in his waist band, "the Fourth Amendment right . . . to be

free from the use of deadly force absent an immediate threat of harm to officers or

others . . . is clearly established."), aff'd as to qualified immunity, 680 F. App'x

589, 591 (9th Cir. 2017.)

### C. Lockwood's Purported Justification for Shooting is Contradicted by All Available Evidence, by his Own Experiences as an Officer, and by the Dictates of Logic and Common Sense

According to Lockwood's Declaration and deposition testimony, the

shooting happens immediately after Edmond runs around a corner in the apartment

complex. The crux of Lockwood's claimed assertion of self defense is reflected in

his Declaration (ER Dkt. 39-1) as follows, in which he states:

> "As Edmond turned, effectively turning back toward my direction, I saw a
> black handgun in Edmon's [*sic*] left hand held in a pistol grip. I believed
> Edmond was starting to turn in order to shoot at me. I then fired my firearm
> four times." (ER 143-44)

Simply put, the assertion that Edmund was "starting to turn" is not sufficient

to eliminate genuine issues of fact on the issue of the reasonableness of

Lockwood's use of lethal force. Lockwood falls short of asserting any facts demonstrating that Edmond pointed the gun in his direction, held the gun in a threatening manner, or in any way exhibited the type of physical movements that would equate with a deadly threat in the mind of a reasonable police officer in his position. Setting aside the fact that Lockwood has not met his burden as the moving party in the instant motion, there are literally a plethora of additional facts demonstrating genuine issues of fact as to the reasonableness of Officer Lockwood's use of deadly force. Highlights include the following:

a.  Lockwood testified that, after firing two times in rapid succession, he was not sure whether or not Edmond was still holding the gun when he fired his third and fourth rounds. (ER 120; 70:14-72:24)

b.  Lockwood testified that he fired multiple rounds at Edmund as he was in the process of falling to the ground. (ER 121; 74:1-7)

c.  Video footage confirms that the fourth and final shot were fired when the firearm is on the ground and clearly separated from Edmund's falling body. (*See* Lockwoods' Body Worn Camera Footage ("BWV"), ER 151; Exhibit A, at time marker 2:50)

d.   Edmund clearly has his hands raised while running away from Lockwood observable in multiple separate and distinct portions of the video evidence. (*Id.,* at time marker 2:42; 2:46; 2:47; 2:48)

e.   Officer Lockwood testified that at the time of the shooting incident, he was not aware of the fact that Edmund had his hands up during the foot pursuit, demonstrating a demonstrable lack of situational awareness. (ER 123; 82:19-84:14)

f.   Lockwood began shooting Edmond less than 10 seconds after first making contact with him during a sudden, tension-filled foot pursuit, while issuing angry, profanity-laced commands, contrary to any contemporary notions of the tactic of deescalation. (Lockwood's BWV, ER 151, at 2:41-2:50)

g.   The audio portions of the BWV have Lockwood yelling "I'm gonna shoot you" at 2:47, which is before the time in which Edmond arrives at the corner where Lockwood claims he saw the deadly threat which prompted him to shoot. (*Id.,* at 2:47)

h.   Lockwood had not observed  Edmond commit any crime, nor did he have any information suggesting to him that Edmond had committed

21

any crime, prior to engaging him in a foot pursuit with his firearm drawn.

i.   Lockwood had not observed anything remotely resembling any criminal activity prior to and during his approach to the scene of the incident. (ER 110, 112; 32:23-33:1; 41:13-20)

j.   Lockwood had not observed anything remotely resembling any gang activity, saw no gang attire, and saw no gang members prior to and during his approach to the scene of the incident. (ER; 108-09; 25:6-9; 27:2-21)

k.   Video footage depicting events occurring prior to the shooting depicts a gathering of peaceful people who are completely passive, not agitated, and not  exhibiting any tendencies towards anger or violence. (Lockwood's BWV, ER 151)

l.   Edmond's actions depicted in the BWC video footage are consistent with a man in fear of his life, desperately attempting to run away from an extremely agitated police officer running after him with his firearm drawn while screaming profanity, and the footage does not depict any actions by Edmond which can reasonably be interpreted as being

consistent with Edmond turning toward Lockwood as if to shoot him with a firearm in his left hand. (Lockwood's BWV, ER 151)

m. Edmond testified that he never held, never reached for, and did not even touch the firearm in his left pocket at any time during the incident. (ER 85, 86; 41:22-46:12)

n. The totality of the evidence demonstrates that Edmond was merely attempting to run away from Lockwood, which would be consistent with Lockwood's extensive experience with suspects trying to ditch guns during foot pursuits. (ER 116; 55:11–56:3)

## II.

## OFFICER LOCKWOOD IS NOT ENTITLED TO QUALIFIED IMMUNITY

A. **Clearly Established Case Precedents Demonstrate Than An Officer's Use of Deadly Force Against a Non-Threatening Suspect in Possession of a Firearm Constitutes an Unlawful Use of Deadly Force**

The seminal Supreme Court case of *Tennessee v. Garner,* 471 U.S. 1, 11 (1985) established the fundamental precept that in cases involving foot pursuits, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to

23

prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12. In expanding upon this principle, this Court has held that even in cases in which a suspect was armed with, and holding, a firearm, clearly established law precludes the application of qualified immunity if a suspect is not facing in the direction of, and pointing a gun at, shooting officers. *Curnow By and Through Curnow v. Ridgecrest Police,* 952 F.2d 321, 234 (9th Cir. 1991.)

### *Curnow v. Ridgecrest Police*

In *Curnow,* police officers broke down a door to confront a suspect. 952 F.2d at 323. The officers claimed that as they entered through the doorway, the suspect picked up a nearby firearm and raised the weapon as he began to turn towards the officers. Id. However, for summary-judgment purposes only, the court accepted as true the contrary testimony of a witness who stated the suspect did not have the gun in his hand, did not raise his arm, and did not turn toward the officers. *Id.* The officers shot the suspect in the back. *Id.* This Court held, "[T]he police officers could not reasonably have believed the use of deadly force was lawful because [the suspect] did not point the gun at the officers and apparently was not facing them when they shot him the first time." *Id.* at 325. Although this case involved a foot chase, while *Curno*w involved officers breaking down a door to intercept a seated suspect they believed was armed, both *Curnow* and the

24

present case gave notice that even if a suspect is definitively known to be armed, qualified immunity is not warranted if genuine issues of fact exist on the issue of whether that suspect is threatening officers with a gun. *Id.* at 325. This case presents precisely this same issue, as Officer Lockwood's version of events, holding that Mr. Edmond threatened him with a gun, by turning towards him in threatening manner, is flatly and directly contradicted by Plaintiff Edmond's sworn testimony that he never held, never reached for, and did not even touch the firearm at any time during the incident. (ER 85, 86; 41:22-46:12) Based on this fact alone, *Curnow* informs the unconstitutionality of this shooting if Plaintiff Edmond's version of events is deemed to be true. Moreover, this Court has directly affirmed the application of *Curnow* to deny qualified immunity in cases such as this one.

*Estate of Lopez v. Gelhaus*

In *Estate of Lopez v. Gelhaus,* 871 F.3d 998 (9th Cir. 2017), this Court proffered a useful analysis in a case in which the Plaintiff's decedent, unlike Plaintiff Edmond, was *actually holding* an object closely resembling a firearm, and, after the officer yelled "drop the gun", the Plaintiff (unlike Plaintiff Edmond) turned towards the officer with the object resembling a gun still in his hand immediately before the officer fatally shot him. *Lopez,* at 1010-11.

a. In denying the shooting deputy's entitlement to qualified immunity due to disputed factual issues, this Court reasoned as follows, while citing an abundance of relevant case law from this Court, including *Curnow*:

> On these facts, a reasonable jury could conclude that [Plaintiff's decedent] did not pose an "immediate threat to the safety of the officers or others," *George v. Morris,* 736 F.3d 829, at 838 (9th Cir., 2013) (internal quotation marks omitted), and that [the shooting officer's] use of deadly force therefore was not objectively reasonable. In cases involving comparable degrees of apparent danger, we have rejected summary judgment on Fourth Amendment claims. *See id.* (denying summary judgment where a suspect held a gun in his left hand with the barrel pointing down, and did not point the gun at the officers or engage in threatening behavior); see also *Hughes v. Kisela,* 841 F.3d 1081, 1085-87 (9th Cir. 2016) (rejecting summary judgment where a woman was shot as she approached another person while holding a knife down by her side, but where the woman with the knife did not make any aggressive or threatening actions and did not understand what was happening when the officers yelled for her to drop the knife); *Hayes v. Cty. of San Diego,* 736 F.3d 1223, 1233-34 (9th Cir. 2013) (reversing a district court's grant of summary judgment where a victim approached officers while armed with a knife, but where the suspect "was not charging them," "had not been ordered to stop," "was given no warning," and was not witnessed acting erratically with the weapon); *Curnow By and Through Curnow v. Ridgecrest Police,* 952 F.2d 321, 324-25 (9th Cir. 1991) (rejecting summary judgment where the suspect had a gun, but where the suspect was not pointing it at the officers, and was not directly facing the officer who opened fire).

*See Lopez,* 871 F.3d 998, at 1010.

*Harris v. Roderick*

In *Harris v. Roderick,* 126 F.3d 1189, 1204 (9th Cir. 1997)*,* an FBI agent was instructed to shoot any armed male near a particular home. 126 F.3d at 1202. The officer saw a suspect returning to the home who he believed had killed an FBI agent the previous day. *Id.* at 1203. While perched safely on a hill, the agent shot the suspect without warning, without the opportunity to surrender, and despite the fact that the suspect had made no threatening movement of any kind. *Id.* at 1203. This Court held that the law was clearly established that the use of deadly force in that circumstance was not objectively reasonable. *Id.* "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Id.* at 1204. In denying qualified immunity, this Court concluded "[o]n the facts as we must regard them, that statement put [the shooting officer] on notice that his use of deadly force was constitutionally excessive." *Harris,* at 1018-19.

*Gonzalez v. City of Los Angeles,* 2017 U.S. Dist. LEXIS 224067[1]

In *Gonzalez v. City of Los Angeles,* 2017 U.S. Dist. LEXIS 224067, the district court evaluated a summary judgment motion in connection with an officer involved shooting that involved a decedent who was in possession of a handgun

_____

[1] Contrary to Defendants' assertion, this is not an unpublished decision.

27

who ran from LAPD gang detectives on foot after they approached the sidewalk
where he was walking. (*See Gonzalez,* 2017 U.S. Dist. LEXIS 224067, at **2-3).
While it was undisputed that the decedent was in possession of a handgun, there
was a factual dispute as to the extent, if any, that the decedent was threatening the
detectives at the time of the shooting. Specifically, the shooting gang detective
(like Officer Lockwood) claimed that the decedent removed a black handgun from
his waistband, ignored orders to drop the gun, and pointed the handgun at him,
prompting the detective to fire in self-defense, similar to Lockwood's justification
for firing here. *Gonzalez,* at **3-4. Conversely, the plaintiffs presented evidence
obtained from video footage (like Plaintiff Edmond) that the decedent was not
using the object(s) in his hands in a threatening manner prior to the shooting . *Id.,*
at **5-7. In determining that genuine issues of fact precluded summary judgment
as to the plaintiffs' survival action for Fourth Amendment violations, the Court
reasoned as follows:

> It is further uncontested that handguns were located near Decedent's body
> following the encounter. However, there exists a triable issue of material
> fact as to whether Decedent pointed a gun at Detective Velasquez, or if he
> ran away without stopping. As such, a triable issue exists as to whether
> Gonzalez posed an immediate threat to the safety of the officers at the time
> they fired their service weapons. Accordingly, the Court DENIES
> Defendants' Motion for Summary Judgment as to Plaintiffs' Section 1983
> Fourth Amendment claims against Detective Velasquez.

*Gonzalez,* at *16.

*Menjivar v. City of Los Angeles,* 2007 U.S. Dist. LEXIS 95928[2]

In another foot pursuit case involving a motion for summary judgment filed by a shooting LAPD officer, the court evaluated an officer involved shooting in which the responding officers, who were conducting a "bar check", engaged in a foot pursuit of a suspect in possession of a firearm who had run out of the rear door of the establishment. *Menjivar v. City of Los Angeles,* 2007 U.S. Dist. LEXIS 95928, **1-2. Similar to Officer Lockwood's version of events, at the culmination of the foot pursuit, the shooting officer claimed that the suspect had spun towards him and pointed a gun at him. *Menjivar v. City of Los Angeles,* 2007 U.S. Dist. LEXIS 95928, at **5-6. In denying summary judgment, the Court recognized Ninth Circuit cases holding that a suspect's mere possession of a firearm does not justify and officer's use of deadly force, reasoning as follows:

> Eyewitness Villarroel testified that he did not see a gun in Lopez's hands, that he did not see Lopez turn toward Hernandez at any time before he fell to the ground, and that he did not see Lopez point his hand toward Hernandez. He also testified that Lopez's hands were at his side "in a normal running position." . . . If the jury credits Clark's and/or Villarroel's testimony, it may conclude that Lopez had turned away and running from Hernandez when he was shot, rendering Hernandez's use of force unreasonable. *See Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-25 (9th Cir. 1991) (holding that deadly force was unreasonable where the suspect possessed a semi-automatic rifle but was not pointing it at the officers and was not facing the officers when they shot); see also *Haugen,* 351 F.3d at

---

[2] Contrary to Defendants' assertion, this is not an unpublished decision.

383 ("Under Ninth Circuit precedent, the mere presence of a weapon does not justify the use of deadly force. . . . Movements by a suspect are not enough to justify deadly force if, in light of the relevant circumstances, those movements would not cause a reasonable officer to believe that the suspect was reaching for a weapon).

Hence, following the seminal Supreme Court case of *Tennessee v. Garner,* there is a substantial body of well established Ninth Circuit case law predating this incident that would serve to put Officer Lockwood on notice that in cases involving foot pursuits of armed suspects, a suspect's mere possession of a firearm does not justify the use of deadly force, and the use of deadly force is unlawful against an armed suspect that is not wielding the firearm in a manner which would be deemed threatening to a reasonable officer.

Hence, there is, quite literally a plethora of published case authorities demonstrating the unconstitutionality of Officer Lockwood's use of deadly force, if Plaintiff Edmond's version of events is taken as true.

## B.  Easely v. City of Riverside is Totally Distinguishable From this Case

Defendants/Appellants' oft cited case authority, *Easely v. City of Riverside,* 890 F.3d 851 is totally distinguishable from the instant case. In *Easely* a Police officer who shot the plaintiff following a traffic stop was entitled to qualified immunity as to a Fourth Amendment excessive force claim in a fact pattern

involving a plaintiff who, while running from the officer, pulled a gun from his

pants pocket and threw it away, prompting the officer to fear that the plaintiff had

a gun and was turning to shoot him. *Easely,* at 854. Defendants' invocation of

Easely is totally misplaced here, as it entirely ignores Plaintiff Edmond's version

of events.  Here, a genuine factual dispute exists, as Edmond testified that he never

held, never reached for, and did not even touch the firearm in his left pocket at any

time during the incident. (ER 85, 86; 41:22-46:12)

## III.  CONCLUSION

For all of the foregoing reasons, this Court should affirm the judgment of

the District Court.

DATED: September 16, 2022    Respectfully submitted,

**THE COCHRAN FIRM CALIFORNIA**

By: /s/ Brian T. Dunn_____
      Brian T. Dunn, Esq. (SBN 176502)
      Email: bdunn@cochranfirm.com
      THE COCHRAN FIRM CALIFORNIA
      4929 Wilshire Boulevard, Suite 1010
      Los Angeles, California 90010
      Telephone: (323) 435-8205
      Facsimile: (323) 282-5280
      Attorneys for Plaintiff/Appellee Jarron
      Edmond

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 16th day of September, 2022, this brief, Appellee's Answer Brief, was served on the parties by electronically filing it with this Court.

<u>**STATEMENT OF RELATED CASES**</u>

Pursuant to 9th Cir. Rule 28-2.6, the undersigned counsel is not aware of any related cases.

DATED: September 16, 2022    Respectfully submitted,

**THE COCHRAN FIRM CALIFORNIA**

By: /s/ Brian T. Dunn
        Brian T. Dunn, Esq. (SBN 176502)
        Email: bdunn@cochranfirm.com
        THE COCHRAN FIRM CALIFORNIA
        4929 Wilshire Boulevard, Suite 1010
        Los Angeles, California 90010
        Telephone: (323) 435-8205
        Facsimile: (323) 282-5280
        Attorneys for Plaintiff/Appellee Jarron
        Edmond

32

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-55024

I am the attorney or self-represented party.

**This brief contains** 6309 **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
  - ○ it is a joint brief submitted by separately represented parties;
  - ○ a party or parties are filing a single brief in response to multiple briefs; or
  - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated _____.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Brian T. Dunn    **Date** September 16, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/2018*